**FILED**

**SEPTEMBER 28, 2010**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| DELBERT HEARD,<br><br>                    Plaintiff,<br><br>vs.<br><br>WEXFORD HEALTH SOURCES,<br>WILLARD O. ELYEA, DR.<br>PARTHASARATHI GHOSH,<br>DR. LAWRENCE NGU,<br><br>                    Defendants. | Case No:1:06-CV-00644<br><br>JURY TRIAL DEMANDED |

### FOURTH AMENDED COMPLAINT

Plaintiff Delbert Heard ("Mr. Heard"), through his court-appointed counsel, Dewey & LeBoeuf LLP, as and for his Fourth Amended Complaint under the Civil Rights Act, Title 42, Section 1983 of the United States Code ("Section 1983"), against defendants Wexford Health Sources ("Wexford"), Willard O. Elyea ("Elyea"), Dr. Parthasarathi Ghosh ("Ghosh"), and Dr. Lawrence Ngu ("Ngu"), (collectively, Wexford, Elyea, Ghosh, and Ngu are "Defendants"), states as follows:

### INTRODUCTION

1.     Plaintiff Heard is a state prisoner who, from 2000 through 2003, was incarcerated at the Pontiac Correctional Center ("Pontiac") in Pontiac, Illinois and, from 2003 to 2006, was incarcerated at the Stateville Correctional Center ("Stateville") in Joliet, Illinois. During the time of his confinement at both Pontiac and Stateville, Mr. Heard complained of pain and limitations in his activities of daily living due to two inguinal hernias. The Defendants, with deliberate

indifference to Mr. Heard's physical pain and suffering, denied Mr. Heard a relatively inexpensive and necessary surgical procedure to repair his hernias.

2.     In denying Mr. Heard surgery, the Defendants—particularly defendants Wexford, Elyea and Ghosh—ignored the competent professional medical advice of three other physicians (and the weight of medical literature) recommending surgical repair of such hernias. With their denials, these four defendants articulated no reasonable basis for disregarding the advice of medical experts and reliable literature and even failed to conduct their own independent medical examinations of Mr. Heard. And, although Dr. Ngu (a Wexford employee) referred Mr. Heard to a surgeon for a determination as to whether surgical repair was appropriate or necessary, Dr. Ngu failed to take any steps when the referring surgeon recommended surgery for Mr. Heard.

3.     Based on the evidence developed in this case, it appears that the Defendants exercised deliberate indifference to Mr. Heard's medical condition by relying on a policy, which was described in detail in Wexford's own procedures, of denying surgery for all but life-threatening hernias in order to save money, rather than on their own professional medical judgment. Indeed, Mr. Heard was unable to obtain surgery for his hernias until 2007, when one of the hernias became life-threatening. These individuals' actions—putting money before the medical needs of the people entrusted to their care—are shocking to the conscience and constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Due to the Defendants' willful, knowing and deliberate indifference, Mr. Heard has suffered extensive pain, for which he seeks recompense in this lawsuit.

## JURISDICTION AND VENUE

4.     This is a civil rights action to redress the deprivation under color of state law of rights, privileges and immunities secured to Mr. Heard by the Eighth Amendment of the United States Constitution and 42 U.S.C. § 1983.

5.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), The asserted rights and interests of the plaintiff exceed seventy-five thousand dollars ($75,000.00) exclusive of interest and costs.

6.     This action properly lies within this judicial district under the provisions of 28 U.S.C. §§ 1391(b) and/or 1406(b).

## THE PARTIES

7.     Delbert Heard, prisoner identification number B76789, is currently confined at the Pontiac Correctional Center.  At all times relevant to this action, Mr. Heard was confined at Pontiac and Stateville.

8.     Defendant Wexford is a private company that provides medical services, under contract with the Illinois Department of Corrections ("IDOC"), for prisoners at various correctional facilities, including Stateville.  At all times pertinent to this case, Wexford had primary responsibility for providing medical services at both Pontiac and Stateville.  Wexford instituted cost-cutting policies at both Pontiac Stateville through its employees, including Defendants Ghosh and Ngu that led to Mr. Heard being deprived of constitutionally appropriate medical care.

9.     Defendant Elyea was the Medical Director of IDOC.  He was personally involved in reviewing and denying Mr. Heard's requests for hernia-repair surgery.

10.     Defendant Ghosh was a Wexford employee and the Medical Director of Stateville during the pertinent time period.  Defendant Ghosh also was personally involved in: (i) implementing Wexford's cost-cutting policies; and (ii) reviewing and denying Mr. Heard's requests for hernia-repair surgery.

11.     Defendant Ngu was a Wexford employee, providing medical services at Stateville during the pertinent time period.  Defendant Ngu also was personally involved in: (i)

3

implementing Wexford's cost-cutting policies; and (ii) was aware that Mr. Heard had hernias, was suffering pain from those hernias, and could benefit from surgical repair of his hernias, yet failed to take adequate steps to ensure that Mr. Heard received adequate medical care.

### ALLEGATIONS COMMON TO ALL COUNTS

12.     In this case, medical professionals charged with providing medical care to inmates in the Illinois Department of Corrections system regularly and systematically deprived Mr. Heard of needed surgery for his hernias, ignoring sound medical practices in favor of cost-saving measures implemented by IDOC officials (including Dr. Elyea), Wexford, and Wexford employees (including Drs. Ghosh and Ngu).

**B.     Wexford's Cost-Cutting Policy**

13.     Indeed, for years, Wexford, in its capacity as a medical services provider to inmates in IDOC facilities, has maintained a policy of not approving the surgical repair of an inguinal hernia unless the hernia is incarcerated or strangulated—in other words, until the hernia was life-threatening.

14.     Under Wexford's policy, the cost of such surgical repair is outweighed by the risk of any such surgery.  Wexford's policy ignores the risks of not performing hernia-repair surgery for non-incarcerated or strangulated hernias—*i.e.,* that the hernia will become incarcerated or strangulated.

15.     Wexford's policy (and the policy condoned and followed by Defendant Elyea and implemented by Defendants Ghosh and Ngu) flies in the face of commonly accepted medical wisdom, which provides that: (i) the risks of hernia-repair surgery are minimal for all but a select few patients; (ii) the risk of not performing hernia-repair surgery is that a simple hernia will become incarcerated or strangulated; and (ii) surgical repair is the only long-term medical solution for hernias.

4

16.     Indeed, in *Surgical Options in the Management of Groin Hernias*, American Family Physician (Jan. 1, 1999) (Attachment A), Drs. Bax, Sheppard, and Crass opine that "[a]lmost all groin hernias should be surgically repaired. When the potential complications of incarceration and strangulation are weighed against the ***minimal risks*** of hernia repair (particularly when local anesthesia is used), the early repair of groin hernias is clearly justified." (emphasis added.)

17.     In other words, even if a general practitioner or surgeon recommends surgical repair of a non-incarcerated or strangulated inguinal hernia—based on sound medical judgment and the physician's personal inspection of the inmate's symptoms—Wexford and its employees will deny such surgery in order to save money.

18.     In such situations, Wexford and its employees will steadfastly deny hernia-repair surgery unless an inmate takes an extraordinary step, such as filing a lawsuit, to obtain such surgery.

19.     Essentially, Wexford and its employees will deny an inmate access to hernia-repair surgery—which costs no more than $2,000—until the inmate makes it more expensive for Wexford and officials like Elyea to continue to deny such access.

## C.     Mr. Heard's Hernia And The History Of Cruel And Unusual Punishment

20.     According to Mr. Heard, his hernias restricted the flow of blood to his penis, painfully restricted the flow of his urination, caused him excruciating pain when he coughed or sneezed, excruciating pain in his testicals, and significantly restricted both his normal daily activities and his ability to strenuously exercise, which was detrimental to his overall health.

21.     In 1997, two medical professionals in the IDOC system—Drs. Manabat and Castrovillo—recommended and approved Mr. Heard for surgical repair of his inguinal hernias. Yet, for reasons that are unclear from Mr. Heard's medical file, such surgery never took place.

5

22.     During the course of his incarceration at Pontiac (from 2000 to 2003), Mr. Heard and family members acting on his behalf complained on at least five separate occasions of the pain he suffered from his two inguinal hernias and on the impact those hernias had on his activities of daily living.

23.     When Mr. Heard arrived in Stateville in 2003, he continued his complaints, informing the medical staff of the pain he continued to suffer from his two inguinal hernias and of the impact of these hernias on his activities of daily living.  He was denied surgical repair of those hernias, however.

24.     In 2003, Wexford employee Defendant Ngu examined Mr. Heard.  At this time, Defendant Ngu prescribed Motrin to Mr. Heard in response to Mr. Heard's complaints about his hernias.

25.     At some point in 2004, Mr. Heard's hernias became so large that they descended into his scrotum, causing increased swelling, pain in his testicles and mental anguish.

26.     Also in 2004, Wexford employee Defendant Ngu again examined Mr. Heard and again prescribed Motrin to Mr. Heard in response to Mr. Heard's complaints about his hernias.

27.     In September of 2004, an unknown employee of Wexford referred Mr. Heard to an outside surgeon to determine the proper course of treatment.  On September 15, 2004, Dr. Saeed Darbandi, a contract employee of Wexford, examined Mr. Heard.  At this time, Dr. Darbandi recommended surgery for Mr. Heard to repair the bilateral hernias Mr. Heard had been complaining about for more than 7 years.

28.     Also on September 15, 2004, Defendant Ghosh reviewed the recommendation of Dr. Darbandi and denied this recommendation that Mr. Heard receive surgery for treatment of

his hernias. Defendant Ghosh performed only a cursory examination of Mr. Heard, and never inquired into the pain from which Mr. Heard was suffering. Defendant Ghosh is not a surgeon.

29.     Shortly thereafter, Mr. Heard appealed this denial of Dr. Darbandi's recommendation for surgery to the Governor's Office of Citizens Assistance. That letter was forwarded to IDOC and Defendant Elyea's office for review and response. At that time, Dr. Elyea concluded that surgery was unnecessary because there were no findings that would warrant surgery at that time. Defendant Elyea performed no independent examinations of Mr. Heard and is not a surgeon.

30.     In 2005, Wexford employee Defendant Ngu again examined Mr. Heard. After his examination of Mr. Heard, Defendant Ngu determined that Mr. Heard's condition still justified seeing a surgeon to determine the proper course of treatment.

31.     In March of 2005, Dr. Saeed Darbandi, a contract employee of Wexford, examined Mr. Heard on the recommendation of Defendant Ngu. At this time, Dr. Darbandi again recommended surgery for Mr. Heard to repair the bilateral hernias Mr. Heard had been complaining of for nearly 8 years.

32.     In March of 2005, Defendant Ghosh reviewed the recommendation of Dr. Darbandi and again denied this recommendation that Mr. Heard receive surgery for treatment of his hernias. Defendant Ghosh performed only a cursory examination of Mr. Heard, and never inquired into the pain from which Mr. Heard was suffering. Defendant Ghosh is not a surgeon.

33.     In March of 2005, Mr. Heard's sister, Ms. Rosetta Webb, again appealed to Defendant Elyea for review of Defendant Ghosh's denial of Mr. Heard's surgery to repair his inguinal hernias.

34.     Defendant Elyea concluded that surgery was unnecessary because there were no factual findings of incarceration or strangulation.  Defendant Elyea never met personally with Mr. Heard.  Instead, he met with Defendant Ghosh.

35.     Defendants Elyea and Ghosh never inquired as to the pain and lack of mobility that Mr. Heard was suffering.

36.     Indeed, in denying Mr. Heard hernia-repair surgery, Defendants Elyea and Ghosh deliberately disregarded the opinion of three medical professionals that surgery was needed: Drs. Manabat, Castrovillo and Darbandi.

37.     Defendant Elyea took this cruel and unusual punishment one step further.  In a letter denying Mr. Heard's request for hernia-repair surgery, Defendant Elyea willfully misrepresented the medical record, stating that there were no "factual findings" justifying surgery "at this time."  Defendant Elyea failed to mention the medical opinions of Drs. Manabat, Castrovillo and Darbandi.

38.     Indeed, according to Defendant Elyea, he did not tell Mr. Heard that there had been "factual findings" because the three medical professionals did not detail, in Mr. Heard's medical records, the factual basis for their medical opinions.  Yet, Defendant Elyea also admitted that he had never heard of a medical professional working in the IDOC system offering a medical opinion without first making factual findings and that he had never spoken with any of the three other medical professionals.

39.     Defendant Elyea's outrageous behavior is indicative of the manner in which all of the defendants have dealt with Mr. Heard—elevating cost-cutting measures over professional medical judgment and even common human decency.

**D.     One of Mr. Heard's Hernias Becomes Incarcerated**

40.     In May of 2007, one or both of Mr. Heard's hernias became so large that they caused swelling in his scrotum, pain in his testicles, a bowel blockage, and mental anguish.  At this time, at least one of Mr. Heard's hernias became incarcerated, threatening more permanent bowel-damage, at a minimum, and possibly more severe health risks, as well.

41.     Only at this time—after causing Mr. Heard to suffer ten years of cruel and unusual torture—did Wexford and its employees afford Mr. Heard the $2,000 surgical treatment needed to repair his hernias.

**COUNT I**
**(Against Defendant Elyea)**
**Cruel and Unusual Punishment**

42.     Plaintiff adopts herein by reference the allegations contained in paragraphs 1-43.

43.     The purpose of Section 1983 is to deter state actors, and private individuals in collaboration with state officials, from using a "badge of authority" to deprive individuals of rights guaranteed by the Constitution.

44.     Under Section 1983, governmental immunity is to be denied, and compensatory damages awarded, when a state actor or collaborating private citizen has acted with either an impermissible motivation or with such disregard of the person's clearly established constitutional rights that such action cannot reasonably be characterized as being in good faith.

45.     Defendant Elyea's behavior is sufficiently outrageous as to shock the conscience.

46.     Indeed, Defendant Elyea denied Mr. Heard's appeals for surgical repair of his hernias despite the fact that doctors working within the IDOC system had recommended surgery in 1996.  Defendant Elyea even lied to Mr. Heard about Mr. Heard's medical records.

47.     Defendant Elyea denied Mr. Heard's surgery for cost-cutting reasons that had no relationship to professional medical judgment.  In fact, Defendant Elyea admitted under oath that

he did not remember Mr. Heard, had not been his treating doctor, had never personally met him, and did not talk to any doctor that had examined Mr. Heard first-hand before denying Mr. Heard's request for surgery.

48. Defendant Elyea's actions caused Mr. Heard to suffer needless pain and mental anguish.

WHEREFORE, Plaintiff Heard prays that this Court:

    A.     Order Defendant Elyea liable for violations of Section 1983;

    B.     Order Defendant Elyea to pay Plaintiff Heard damages in an amount of at least $1,000,000 to be proven at trial; and

    C.     Order such further relief as the court deems just and proper.

## COUNT II
### (Against Defendants Wexford, Ghosh & Ngu)
### Cruel and Unusual Punishment

49. Plaintiff adopts herein by reference the allegations contained in paragraphs 1-50.

50. The purpose of Section 1983 is to deter state actors, and private individuals in collaboration with state officials, from using a "badge of authority" to deprive individuals of rights guaranteed by the Constitution.

51. Under Section 1983, governmental immunity is to be denied, and compensatory damages awarded, when a state actor or collaborating private citizen has acted with either an impermissible motivation or with such disregard of the person's clearly established constitutional rights that such action cannot reasonably be characterized as being in good faith.

52. A corporate defendant violates Section 1983 if, acting under color of state law, it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners.

53. Wexford maintained (and Drs. Ghosh and Ngu implemented) a cost-cutting policy that ensured that prisoners with inguinal hernias—like Mr. Heard—would not receive a relatively inexpensive surgical repair, regardless of the pain and suffering caused by such hernias, unless the hernias were incarcerated or strangulated.

54. This policy ensured that prisoners—and, particularly, Mr. Heard—would suffer the maximum amount of pain and daily inconvenience possible before the relatively inexpensive surgery was performed.

55. Indeed, here, Mr. Heard suffered for 10 years. It was not until his bowel was blocked, the pain he was suffering had become unbearable, and greater medical complications were setting in that Wexford and Dr. Feinerman authorized Mr. Heard to receive a surgery that is not expensive and that common medical wisdom recommends as the ***only solution*** for inguinal hernias.

56. Such a policy shocks the conscience and constitutes cruel and unusual punishment.

WHEREFORE, Plaintiff Heard prays that this Court:

A.     Order Defendants Wexford, Ghosh and Ngu liable under Section 1983;

B.     Order Defendants Wexford, Ghosh and Ngu to pay Mr. Heard damages of at least $1,000,000 in an amount to be proven at trial; and

C.     Order such further relief as the court deems just and proper.

## **Demand for Jury Trial**

Plaintiff hereby requests a trial by jury.


/s/ *Vincent P. Schmeltz III*
Dewey & LeBoeuf LLP
Attorneys for Plaintiff Delbert Heard

Vincent Paul Schmeltz III
Katelyn T. Quimby
DEWEY & LEBOEUF LLP
180 North Stetson, Suite 3700
Two Prudential Plaza
Chicago, IL 60601-6710
Telephone: 312-794-8000
Facsimile: 312-794-8100

12

# ATTACHMENT A

# Surgical Options in the Management of Groin Hernias

TIM BAX, M.D., BRETT C. SHEPPARD, M.D., and

RICHARD A. CRASS, M.D.

Oregon Health Sciences University,

Portland, Oregon

Inguinal and femoral hernias are the most common conditions for which primary care physicians refer patients for surgical management. Hernias usually present as swelling accompanied by pain or a dragging sensation in the groin. Most hernias can be diagnosed based on the history and clinical examination, but ultrasonography may be useful in differentiating a hernia from other causes of groin swelling. Surgical repair is usually advised because of the danger of incarceration and strangulation, particularly with femoral hernias. Three major types of open repair are currently used, and laparoscopic techniques are also employed. The choice of technique depends on several factors, including the type of hernia, anesthetic considerations, cost, period of postoperative disability and the surgeon's expertise. Following initial herniorrhaphy, complication and recurrence rates are generally low. Laparoscopic techniques make it possible for patients to return to normal activities more quickly, but they are more costly than open procedures. In addition, they require general anesthesia, and the long-term hernia recurrence rate with these procedures is unknown.

Inguinal and femoral hernias are the most common problems primary care physicians encounter that require surgical intervention. The treatment of these hernias costs approximately $3.5 billion every year.[1] Untreated or recurrent inguinal hernias are responsible for an incalculable loss of productivity and revenue. Postoperative convalescence also contributes to absence from the work force.

A clear understanding of the epidemiology and anatomy of inguinal hernias provides a solid foundation for timely diagnosis and care. Since inguinal herniorrhaphy can be performed using a variety of techniques, the approach can be individualized. This article reviews the available surgical options for herniorrhaphy and the possible complications of these procedures.

## Epidemiology

In the United States, approximately 96 percent of groin hernias are inguinal and 4 percent are femoral. Inguinal hernias are bilateral in as many as 20 percent of affected adults.[1]

The most common hernia in both sexes is the indirect inguinal hernia. The male-to-female ratio is 9:1 for inguinal hernias and 1:3 for femoral hernias. While inguinal hernias occur fairly equally across adult age groups, femoral hernias tend to occur more often in elderly women. The lifetime risk of inguinal herniation is approximately 10 percent.[1]

women. The lifetime risk of inguinal herniation is approximately 10 percent.[1]



**Figure 1.** Hesselbach's triangle. This anatomic landmark is bounded by the rectus abdominis muscle medially, the inguinal ligament inferiorly and the inferior epigastric vessels laterally. The triangle is outlined in red.

## Anatomy of Groin Hernias

Inguinal hernias are broadly classified as indirect or direct, designations that refer to the relation of the herniation to the inferior epigastric arteries on the abdominal wall and the Hesselbach's triangle. The anatomic region known as Hesselbach's triangle is defined laterally by the inferior epigastric artery, medially by the lateral border of the rectus muscle and inferiorly by the inguinal ligament *(Figure 1)*. An indirect hernia passes lateral to the inferior epigastric vessels and thus is outside of Hesselbach's triangle *(Figure 2)*, while a direct hernia is medial to the epigastric vessels and therefore within the confines of this space *(Figure 3)*.

An indirect hernia is generally believed to have a congenital component. The development of this type of hernia requires a potential hernia sac, which is provided by the processus vaginalis. After the fetal testis has descended into the scrotum from the retroperitoneum, the processus vaginalis normally obliterates, thereby removing this potential for herniation. Thus, an indirect hernia is the result of two conditions: (1) the existence of a potential space due to nonobliteration of the processus vaginalis and (2) a weakening of the fascia of the transversalis muscle fibers surrounding the exit of the spermatic cord at the internal abdominal ring.



**Figure 2.** Route of an indirect hernia. Note that the hernia sac passes outside of the boundaries of Hesselbach's triangle and

2 of 12

follows the course of the spermatic cord.

Direct inguinal hernias are not generally congenital. Instead, they are acquired by the development of tissue deficiencies of the transversus abdominis muscle, which makes up the floor of the inguinal canal. Thus, these hernias protrude directly through a defect in the inguinal canal floor, rather than indirectly following the potential space of the processus vaginalis and the path of the spermatic cord.

The development of femoral herniation is not well understood. A femoral hernia can occur as a result of elevated intra-abdominal pressure. In this circumstance, preperitoneal fat can protrude through the femoral ring, with its accompanying pelvic peritoneum. The hernial sac can then migrate down along the femoral vessels into the anterior thigh. Women may be predisposed to femoral herniation due to weakness of the pelvic floor musculature from previous childbirth *(Figure 4)*.

An understanding of the innervation of the inguinal region is important, because injury to the nerves in this area may cause significant problems. The major nerves in the inguinal region are the ilioinguinal, iliohypogastric and genitofemoral nerves. The ilioinguinal nerve traverses the inguinal canal near the external inguinal ring and provides unilateral sensory innervation to the pubic region and the upper portion of the scrotum or the labia majora. This is the nerve most commonly injured during open herniorrhaphy. The iliohypogastric nerve passes superior to the internal inguinal ring and provides sensory innervation to the skin superior to the pubis. The genital branch of the genitofemoral nerve travels within the spermatic cord to provide sensation to the scrotum and the medial thigh. The femoral branch of this nerve supplies sensation to the skin of the anterior thigh *(Figure 5)*.

> Ultrasound examination of the inguinal region with the patient in the supine and upright positions and with the Valsalva maneuver is reported to have excellent diagnostic sensitivity and specificity.



Figure 3. Route of a direct hernia. The hernia sac passes directly through Hesselbach's triangle and may disrupt the floor of the inguinal canal.

## Diagnosis

Most early inguinal hernias can be diagnosed by careful physical examination. Except for pain or a dull dragging sensation in the groin, the common reducible inguinal hernia usually does not cause significant symptoms.

Sonography may be useful in diagnosing inguinal hernias in patients who report symptoms but do not have a palpable defect. Ultrasound examination of the inguinal region with the patient in the supine and upright positions and with the Valsalva maneuver has been reported to have a diagnostic sensitivity and specificity of greater than 90 percent.[3] The ultrasound examination may also be helpful in differentiating an incarcerated hernia from a pathologic lymph node or other cause of a firm, palpable mass.



**Figure 4.** Route of a femoral hernia. The hernia sac follows the potential space along the femoral vessels. It may be palpable near the femoral ring or in the medial thigh.

In the extremely rare patient with inguinal pain but no physical or sonographic evidence of inguinal herniation, computed tomographic scanning can be used to evaluate the pelvis for the presence of an obturator hernia.

Preoperatively, it is often difficult to differentiate the common indirect hernia from the less common direct defect. Even skilled examiners may be incorrect in up to 30 percent of cases. However, indirect and direct hernias need to be differentiated during surgery, because the approach to repair depends on the defect type. A hernia that is not repaired appropriately is more likely to recur.

> With few exceptions, all patients who are found to have a groin hernia should undergo surgical repair.

Diagnosing inguinal hernias in children can be very difficult. Surgical consultation is usually warranted if the parent or other caregiver reports that the child has had a groin bulge.

The diagnosis of recurrent herniation is generally straightforward. However, it may be difficult to identify this problem in patients with scarring from a previous repair. In patients who have symptoms suggestive of recurrent herniation but no clinical findings, the diagnosis can usually be obtained through sequential serial examinations and the judicious use of imaging modalities.



**Figure 5.** Global anatomy of the pelvis and inguinal trigone. Note the lush innervation of this region. Both the ilioinguinal nerve and the genitofemoral nerve traverse the usual hernia-repair operative field. The femoral vein also runs just deep to the inguinal floor laterally.

## Classification of Groin Hernias

Classification systems for groin hernias range from simple schemes to more complex systems with up to 20 categories. Most classification systems take into account the location of the defect (direct, indirect or femoral), the size of the defect and whether or not the herniation is recurrent.[1]

While it is often difficult to differentiate hernial types preoperatively, a consistent approach to classifying hernias during surgery can provide information that will allow institutions to compare the outcomes achieved with different types of hernia repair. If one system is universally used to classify hernias, surgeons will be able to perform individualized procedures for specific anatomic defects based on sound outcome data. While a broad consensus on the best classification system has not been achieved, the Nyhus classification system *(Table 1)*[1] is often referred to in the literature.

### TABLE 1
### Nyhus Classification of Groin Hernias

Type I—indirect inguinal hernia
    Internal inguinal ring normal
        (i.e., pediatric hernia)
Type II—indirect inguinal hernia
    Dilated internal inguinal ring with
        posterior inguinal wall intact
Type III—posterior wall defects
    Direct inguinal hernia
    Indirect inguinal hernia: dilated
        internal ring with large
        medial encroachment on the
        transversalis fascia of the
        Hesselbach's triangle (i.e.,
        massive scrotal, sliding
        hernia)
    Femoral hernia
Type IV—recurrent hernia

Adapted with permission from Nyhus LM, Klein MS, Rogers FB. Inguinal hernia. Curr Probl Surg 1991; 28:418.

## Indications for Operative Intervention

Almost all groin hernias should be surgically repaired. When the potential complications of incarceration and strangulation are weighed against the minimal risks of hernia repair (particularly when local anesthesia is used), the early repair of groin hernias is clearly justified. This is especially true in the case of femoral hernias, since the rigid borders of the femoral canal increase the risk of incarceration.

Surgical repair of a hernia is not warranted in terminally ill patients with no evidence of incarceration. Patients with ascites generally should not undergo elective herniorrhaphy until their ascites is controlled.

While some surgeons believe that broad-based direct hernias do not need to be repaired, the uncertainty of determining the status of a hernia preoperatively argues against this practice. The presence of incarceration or strangulation usually mandates urgent operative repair.



© 1999 Floyd E. Hosmer



© 1999 Floyd E. Hosmer

**Figure 6.** McVay open anterior repair. This repair reconstructs the inguinal canal without

**Figure 7.** Open mesh repair. Mesh is used to reconstruct the inguinal canal. Minimal

| using a mesh prosthesis. | tension is used to bring tissues together. |
|---|---|

## Surgical Techniques

Based on operative intent and approach, the many different herniorrhaphy techniques can be grouped into four main categories.

### GROUP 1: OPEN ANTERIOR REPAIR

Group 1 hernia repairs (Bassini, McVay and Shouldice techniques) involve opening the external oblique aponeurosis and freeing the spermatic cord. The transversalis fascia is then opened, facilitating inspection of the inguinal canal, the indirect space and the direct space. The hernia sac is usually ligated, and the canal floor is subsequently reconstructed *(Figure 6).*

The techniques in the open anterior repair group differ somewhat in their approach to reconstruction, but they all use permanent sutures to approximate the surrounding fascia and repair the floor of the inguinal canal. When performed by skilled surgeons, these repairs provide reliable, satisfactory results and have similar recurrence rates. With very large defects or with fascia of marginal quality, the tension of the sutures can lead to recurrence.

The techniques in group 1 are all well suited to the use of local anesthesia.

### GROUP 2: OPEN POSTERIOR REPAIR

Posterior repair (iliopubic tract repair and Nyhus technique) is performed by dividing the layers of the abdominal wall superior to the internal ring and entering the properitoneal space. Dissection then continues behind and deep to the entire inguinal region.

> It is possible to repair over 90 percent of groin hernias using only local anesthetic.

Like the anterior approach, the posterior approach provides excellent visualization of the areas of concern in herniorrhaphy. The major difference between this technique and the anterior approach is that reconstruction is performed from the "inside."

Excellent results have been reported for the posterior techniques, but problems related to suture tension remain.

Posterior repair is often used for hernias with multiple recurrences, because the approach avoids scar tissue from previous surgeries. It is probably best performed with the patient receiving regional or general anesthesia.

### GROUP 3: TENSION-FREE REPAIR WITH MESH

The group 3 hernia repairs (Lichtenstein and Rutkow techniques) use the same initial approach as open anterior repair. However, instead of suturing the fascial layers together to repair the hernia defect, the surgeon uses a prosthetic, nonabsorbable mesh. This mesh allows the hernia to be repaired without ten sion being placed on the surrounding fascia *(Figure 7).* Excellent results have been achieved with this approach, and reported recurrence rates have been less than 1 percent.



© 1999 Floyd E. Hosmer

Figure 8. Laparoscopic mesh repair, viewed from inside the pelvis toward the direct and indirect sites. A broad portion of mesh is stapled to span both hernia defects. Staples are not used in proximity to neurovascular structures.

Some concern exists about the long-term safety of implanted prosthetic material, particularly the potential for infection or erosion. However, extensive accumulated experience with the hernia mesh has begun to alleviate many of these concerns, and tension-free repair continues to gain popularity.[9]

Tension-free repair can be performed using any type of anesthesia. This approach is well suited for outpatient herniorrhaphy performed with the patient receiving local anesthesia.

GROUP 4: LAPAROSCOPIC PROCEDURES

Laparoscopic hernia repair has become increasingly popular in the past few years, but the technique has also sparked significant controversy. Early in the development of the technique, hernias were repaired by placing a large piece of mesh over the entire inguinal region on top of the peritoneum. This approach was abandoned because of the potential for small-bowel obstruction and fistulae development caused by the exposure of bowel to mesh.

Today, most laparoscopic herniorrhaphies are performed using either the transabdominal preperitoneal (TAPP) approach or the total extraperitoneal (TEP) approach. The TAPP approach involves placing laparoscopic trocars in the abdominal cavity and approaching the inguinal region from the inside. This allows the mesh to be placed and then covered with peritoneum. While the TAPP approach is a straightforward laparoscopic procedure, it requires entrance into the peritoneal cavity for dissection. Consequently, the bowel or vascular structures may be injured during the procedure *(Figure 8)*.

### TABLE 2
### Results of Hernia Repairs at Specialty Centers

| Author | Type of repair | Number of patients | Follow-up period | Complication rate (%) | Hernia recurrence rate (%) |
|---|---|---|---|---|---|
| Rutledge[10] | McVay | 906 | 9 years | NR | 2.0 |
| Welsh and Alexander[11] | Shouldice | 214,919 | 1 month to 40 years | NR | 0.1 |
| | Shouldice | 2,748 | 35 years | NR | 1.5 |
| Amid, et al.[5] | Lichtenstein | 3,250 | Average of 4 years (range: 1 to 8 years) | NR | 0.1 |
| Rutkow and Robbins[12] | Rutkow | 2,060 | NR | 0.3 | 0.1 |
| Nyhus[13] | Posterior iliopubic tract repair | 1,200 | 37 years | | 1 to 6 |
| Felix, et al.[14] | Transabdominal preperitoneal laparoscopic repair | 733 | Average of 24 months (range: 1 to 44 | 13.0 | 0.3 |

| | | months) | | |
|---|---|---|---|---|
| Total extraperitoneal laparoscopic repair | 382 | Average of 9 months (range: 1 to 44 months) | 11.0 | 0.3 |

NR=not reported.

Information from references 5, and 10 through 14.

In the TEP approach, an inflatable balloon is placed in the extraperitoneal space of the inguinal region. Inflation of the balloon creates a working space. For most surgeons, the TEP approach to hernia repair is more technically demanding than the TAPP approach.

In both the TAPP and TEP approaches, the hernia sac is reduced, and a large piece of mesh is placed to cover the indirect, direct and femoral areas of the inguinal region. The mesh is held in place by metal staples.

The advantage of these two procedures is that the small laparoscopic incision causes less pain and disability, promoting a faster return to work. This advantage appears to be most notable in patients who do heavy manual labor. Another advantage of the TAPP and TEP approaches is that bilateral hernias may be repaired simultaneously with no apparent increase in morbidity. Finally, these approaches can be particularly effective in patients with hernia recurrence after traditional open herniorrhaphy. In such patients, additional open anterior repairs have a higher failure rate and an increased rate of complications. The laparoscopic approach, similar to the open posterior approach, allows hernia repair to be performed in a previously untouched space.

Early results for laparoscopic surgery are promising, but information on long-term outcomes is currently unavailable. At present, the major drawbacks to laparoscopic herniorrhaphy are the cost of the laparoscopic equipment, the need for general anesthesia and the absence of long-term follow-up data.

## Anesthesia

Hernia repair may be performed using general, regional (spinal/epidural) or local anesthesia. Several studies[2] have found that, with proper preoperative preparation, more than 90 percent of groin hernias can be repaired with patients receiving only a local anesthetic. The advantages of local anesthesia include the very short recovery time and the ability to test the repair intraoperatively with a Valsalva maneuver. Use of local anesthesia also avoids the respiratory and immune depressive effects of general anesthesia. This advantage is particularly important in elderly and frail patients.

Local anesthesia alone does not allow for comfortable and technically optimal herniorrhaphy in patients with a very high anxiety level. Either general or regional (spinal) anesthesia may be used in these patients. General anesthesia provides the most comfort, but it has the highest risk. Patients occasionally respond poorly to a general anesthetic and require overnight hospitalization because of nausea, excessive sedation or urinary retention.

Spinal anesthesia provides excellent pain control during herniorrhaphy, and it carries slightly less risk than general anesthesia. The disadvantages of spinal anesthesia include the time required for the anesthetic to be placed and the possibility of incomplete sensory blockade. Urinary retention or a delay in the return of normal lower extremity sensation may mandate overnight observation following herniorrhaphy performed with regional anesthesia.

## Operative Results

*Tables 2[5,10-13] and 3[5,10-14]* summarize operative results for common herniorrhaphy techniques. Specialty centers continue to report very low complication and recurrence rates in large series of patients.

Most laparoscopic hernia repairs are being performed by skilled laparoscopic surgeons in specialty centers. Early studies showing acceptable outcomes for laparoscopic herniorrhaphy may reflect the same bias other procedure-focused centers have shown for open herniorrhaphy. Studies conducted at nonspecialty centers probably provide a more accurate view of hernia repair techniques and results.

## TABLE 3
### Results of Hernia Repairs at Nonspecialty Centers

| Author | Type of repair | Number of patients | Follow-up period | Complication rate (%) | Hernia recurrence rate (%) |
|---|---|---|---|---|---|
| Panos, et al.[15] | McVay | 136 | Average of 3 years, with a range of 1 to 5 years | NR | 9 |
| | Shouldice | 136 | Average of 3 years, with a range of 1 to 5 years | NR | 7 |
| Paul, et al.[16] | Bassini | 125 | 3.3 years | 28 | 10 |
| | Shouldice | 119 | 3.4 years | 29 | 2 |
| Tran, et al.[17] | Bassini | 63 | 2 years | 18 | 14 |
| | Shouldice | 65 | 2 years | 18 | 11 |
| Ferzli, et al.[18] | Total extraperitoneal laparoscopic repair | 100 | Average of 12 months (range: 6 to 20 months | 6 | 0 |
| Payne, et al.[7] | Transabdominal preperitoneal laparoscopic repair | 52 | Average of 10 months (range: 7 to 18 months | 12 | 0 |
| | Lichtenstein | 58 | Average of 10 months (range: 7 to 18 months | 18 | 0 |

NR=not reported.

Information from references 7, and 15 through 18.

## Complications

The complications following herniorrhaphy are generally minor and self-limited. Wound hematomas and superficial wound infections are the most common problems, and they usually respond to conservative measures. More serious complications, such as major hemorrhage, osteitis and testicular atrophy, occur in fewer than 1 percent of patients undergoing herniorrhaphy.[19] The minor and major complications of open and laparoscopic herniorrhaphies are compared in *Table 4*.

## NERVE ENTRAPMENT

Nerve entrapment is perhaps the most significant complication of inguinal herniorrhaphy. Most nerve entrapment syndromes are self-limited, respond to nonsteroidal analgesics and resolve with time. However, chronic neuralgia can develop.[19]

Entrapment of the ilioinguinal nerve produces pain in the groin and scrotum; extension of the hip frequently exacerbates the pain. Injury to the genital branch of the genitofemoral nerve can cause hypersensitivity of the groin, scrotum and upper thigh, and can be associated with ejaculatory dysfunction. Injection of a long-acting local anesthetic along the course of these nerves is often helpful for diagnosing entrapment.

Following a period of nonoperative care, some patients with nerve entrapment need to be referred for surgical exploration and excision of the involved nerve. However, this corrective approach provides relief in less than 60 percent of patients.

While laparoscopic herniorrhaphy tends to offer greater protection to the ilioinguinal and iliohypogastric nerves, injuries to the femoral or the lateral femoral cutaneous nerves have been reported. Patients with such injuries present with pain in the groin and thigh. While these syndromes are often self-limited, surgery has been necessary to remove the staples that caused the neuralgia. These procedures have not provided pain relief in all patients.

## HERNIA RECURRENCE

Recurrence is the most common long-term complication of inguinal herniorrhaphy. Approximately 50 percent of hernia recurrences do not present until at least five years after the original herniorrhaphy. An additional 20 percent of recurrences may not present for 15 to 25 years.[21]

The reported recurrence rates for surgically treated hernias vary widely, depending on the length and diligence of the follow-up period. In most reports, the recurrence rate varies from 5 to 8 percent for indirect hernias and is slightly higher for direct hernias. In some series, the recurrence rate following repair of a recurrent hernia is as high as 30 percent, which is significantly greater than the recurrence rate after initial repairs. Hernia recurrence following inguinal herniorrhaphy is usually caused by the breakdown of a repair performed with tension along the fascial suture lines.

### TABLE 4
### Complications of Open and Laparoscopic Hernia Repairs

| Open repair | Laparoscopic repair |
|---|---|
| **Major** | **Major** |
| Hemorrhage | Hemorrhage |
| Testicular atrophy | Bowel injury |
| Vas deferens transection | Bladder injury |
| Bowel injury | Major vessel injury |
| Bladder injury | |
| **Minor** | **Minor** |
| Scrotal ecchymosis | Urinary retention |
| Wound infection | Trocar site hernia |
| Urinary retention | Nerve injury |
| Recurrence | Wound infection |
| Hydrocele | Small-bowel obstruction |
| Nerve transection | |
| Nerve entrapment | |

Information from reference 19.

This breakdown may occur because of incomplete dissection, poor tissue quality (longstanding large hernias) or the patient's too-rapid return to daily activities. Systemic comorbidity, such as obesity, steroid use and chronic obstructive pulmonary disease, influence wound healing and can affect the recurrence rate.[9,25]

## Choice of Surgical Procedure

Inguinal hernias continue to be a source of morbidity and significant health care expenditure. No mechanism of preventive care is known, and surgical repair is almost always necessary. With the many techniques available, treatment can be individualized.

Most inguinal hernia repairs can be performed safely, accurately and cost-effectively using local anesthesia and an open anterior approach. Hernia recurrence rates of less than 4 percent have been reported for herniorrhaphies performed without prosthetic mesh by skilled surgeons.[21] Open anterior repair performed with local anesthesia would appear to be the ideal approach in the young patient with an indirect hernia and no systemic disease.

Hernia repair using prosthetic mesh would be a good choice in the patient with a direct hernia or in the older patient with a long-standing hernia and attenuated fascia. In one recent study,[1] more than 60 percent of blue collar workers and 90 percent of desk workers returned to work within 10 days after undergoing tension-free hernia repair with mesh. Recurrence rates in these cases have been reported to be 3 percent or less.[1]

Recurrent hernias repaired with classical herniorrhaphy not utilizing mesh have a reported recurrence rate of approximately 23 percent at three years.[2] For this reason, recurrent hernias are best managed with open anterior or posterior mesh repair or, possibly, with a laparoscopic procedure. Bilateral hernias may also be addressed simultaneously, using either an open or a laparoscopic procedure. The approach is best determined by local expertise.

Laparoscopic herniorrhaphy is becoming a more common procedure. Several studies have demonstrated that this approach is safe and involves only minimal use of pain medication. The recurrence rate following this relatively new technique cannot as be completely assessed, but it has been reported to be less than 4 percent.[25,26]

The advantages of laparoscopic herniorrhaphy for an initial repair appear to be related to speedy convalescence and an earlier return to work. However, caution is advised, since a recent study[27] of open herniorrhaphy showed that return to work was most often determined by the patient's type of insurance coverage rather than the type of procedure used to repair the hernia. Whether this will also be true for laparoscopic herniorrhaphy remains to be seen.

Compared with other types of hernia repair, laparoscopic herniorrhaphy is significantly more expensive. In some series, the laparoscopic approach has been 40 percent more costly than other approaches. Most current techniques for laparoscopic herniorrhaphy also subject patients to the risks and cost of general anesthesia. Performance of the laparoscopic TAPP repair also exposes patients to potential intra-abdominal injury and late adhesion formation. In contrast, tension-free repair using mesh, as well as other types of hernia repair, may be comfortably and safely completed with patients receiving only local anesthesia.

Laparoscopic herniorrhaphy may be best reserved for treatment of recurrent or bilateral hernias. However, individual preference cannot be ignored, and this technique may be advisable for initial hernia repair in selected patients.

In the managed-care environment, elective herniorrhaphy is under increasing pressure. Some state health plans do not reimburse for elective hernia repairs. The long-term impact of complications secondary to untreated herniation is not fully known. A decrease in surgical repair may lead to an increase in hospitalizations related to incarceration or strangulation.

## The Authors

TIM BAX, M.D.,
is a fourth-year resident in general surgery at Oregon Health Sciences University, Portland. Dr. Bax recently completed a year of research in general and minimally invasive surgery.

BRETT C. SHEPPARD, M.D.,
is an assistant professor in the surgery division at Oregon Health Sciences University, Portland, where he received his surgical training. Dr. Sheppard also completed a two-year research fellowship at the National Cancer Institute, Bethesda, Md.

RICHARD A. CRASS, M.D.,
is professor of surgery and head of the general surgery division at Oregon Health Sciences University. Dr. Crass received his surgical training at the University of California, San Francisco, School of Medicine, and completed a two-year research fellowship at Beth Israel Hospital and Harvard Medical School, both in Boston.

Address correspondence to Brett C. Sheppard, M.D., Division of General Surgery, L223A, Oregon Health Sciences University, 3181 S.W. Sam Jackson Park Rd., Portland, OR 97201-3098. Reprints are not available from the authors.

REFERENCES

1. Rutkow IM, Robbins AW. Demographic, classificatory, and socioeconomic aspects of hernia repair in the United States. Surg Clin North Am 1993;73:413-26.
2. Condon RE. The anatomy of the inguinal region and its relation to groin hernia. In: Nyhus LM, Condon RE, eds. Hernia. 3d ed. Philadelphia: Lippincott, 1989:18-64.
3. Schumpelick V, Treutner KH, Arlt G. Inguinal hernia repair in adults. Lancet 1994;344:375-9.
4. Nyhus LM, Klein MS, Rogers FB. Inguinal hernia. Curr Probl Surg 1991;28:401-50.
5. Amid PK, Shulman AG, Lichtenstein IL. A critical evaluation of the Lichtenstein tension-free hernioplasty. Int Surg 1994;79:76-9.
6. Rutkow IM, Robbins AW. Mesh plug hernia repair: a follow-up report. Surgery 1995;117:597-8.

7. Payne JH Jr, Grininger LM, Izawa MT, Podoll EF, Lindahl PJ, Balfour J. Laparoscopic or open inguinal herniorrhaphy? A randomized prospective trial. Arch Surg 1994;129:973-9.

8. Tinckler L. Inguinal hernia repair using local anaesthesia. Ann R Coll Surg Engl 1985;67:268.

9. Ponka JL. Seven steps to local anesthesia for inguino femoral hernia repair. Surg Gyn Obstet 1963; 117:115-20.

10. Rutledge RH. The Cooper ligament repair. Surg Clin North Am 1993;73:471-85.

11. Welsh DR, Alexander MA. The Shouldice repair. Surg Clin North Am 1993;73:451-69.

12. Rutkow IM, Robbins AW. Mesh plug hernia repair: a follow-up report. Surgery 1995;117:597-8.

13. Nyhus LM. Iliopubic tract repair of inguinal and femoral hernia. The posterior (preperitoneal) approach. Surg Clin North Am 1993;73:487-99.

14. Felix EL, Michas CA, Gonzalez MH Jr. Laparoscopic hernioplasty. TAPP vs TEP. Surg Endosc 1995; 9:984-9.

15. Panos RG, Beck DE, Maresh JE, Harford FJ. Preliminary results of a prospective randomized study of Cooper's ligament versus Shouldice herniorrhaphy technique. Surg Gynecol Obstet 1992;175:315-9.

16. Paul A, Troidl H, Williams JI, Rixen D, Langen R. Randomized trial of modified Bassini versus Shouldice inguinal hernia repair. The Cologne Hernia Study Group. Br J Surg 1994;81:1531-4.

17. Tran VK, Putz T, Rohde H. A randomized controlled trial for inguinal hernia repair to compare the Shouldice and the Bassini-Kirschner operation. Int Surg 1992;77:235-7.

18. Ferzli GS, Massaad A, Dysarz FA 3d, Kopatsis A. A study of 101 patients treated with extraperitoneal endoscopic laparoscopic herniorrhaphy. Am Surg 1993;59:707-8.

19. Condon RE, Nyhus LM. Complications of groin hernia. In: Nyhus LM, Condon RE, eds. Hernia. 3d ed. Philadelphia: Lippincott, 1989:253-65.

20. Starling JR, Harms BA. Diagnosis and treatment of genitofemoral and ilioinguinal neuralgia. World J Surg 1989;13:586-91.

21. Ijzermans JN, de Wilt H, Hop WC, Jeekel H. Recurrent inguinal hernia treated by classical hernioplasty. Arch Surg 1991;126:1097-100.

22. Lichtenstein IL, Shulman AG, Amid PK. The cause, prevention, and treatment of recurrent groin hernia. Surg Clin North Am 1993;73:529-44.

23. Lowham AS, Filipi CJ, Fitzgibbons RJ Jr, Stoppa R, Wantz GE, Felix EL, et al. Mechanisms of hernia recurrence after preperitoneal mesh repair. Traditional and laparoscopic. Ann Surg 1997;225:422-31.

24. Rutkow IM. The recurrence rate in hernia surgery. How important is it? Arch Surg 1995;130:575-6.

25. Fitzgibbons RJ Jr, Camps J, Cornet DA, Nguyen NX, Litke BS, Annibali R, et al. Laparoscopic inguinal herniorrhaphy. Results of a multicenter trial. Ann Surg 1995;221:1-13.

26. Liem MS, van Graaf Y, van Steensel CJ, Boelhouwer RU, Clevers GJ, Meijer WS, et al. Comparison of conventional anterior surgery and laparoscopic surgery for inguinal-hernia repair. N Engl J Med 1997;336:1541-7.

27. Salcedo-Wasicek MC, Thirlby RC. Postoperative course after inguinal herniorrhaphy. A case-controlled comparison of patients receiving workers' compensation vs patients with commercial insurance. Arch Surg 1995;130:29-32.

Copyright © 1999 by the American Academy of Family Physicians.

This content is owned by the AAFP. A person viewing it online may make one printout of the material and may use that printout only for his or her personal, non-commercial reference. This material may not otherwise be downloaded, copied, printed, stored, transmitted or reproduced in any medium, whether now known or later invented, except as authorized in writing by the AAFP.

January 1, 1999 Contents | Subscribe | Search | *AFP* Home Page