IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DELBERT HEARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 06 C 644 |
| v. ) | |
| ) | Judge Virginia M. Kendall |
| ILLINOIS DEPARTMENT OF ) | |
| CORRECTIONS, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

In May 2007, plaintiff Delbert Heard was rushed from Menard Correctional Facility to the hospital for emergency surgery on his incarcerated hernia. Heard sued Wexford Health Sources, Inc. ("Wexford"), an Illinois Department of Corrections' (IDOC) healthcare contractor, Dr. Partha Ghosh, a Wexford employee, and Dr. Williard Elyea, IDOC's medical director, alleging that they ignored his worsening hernias for years, choosing to treat them with ibuprofen and "watchful waiting" rather than surgery. Wexford and the doctors assert that they were following established policy and Heard's case is nothing more than Heard disagreeing with their medical judgment about how to treat the hernias. For the below reasons, the Court denies the defendants' motions and the case must proceed to trial.

**I.  MATERIAL UNDISPUTED FACTS[1]**

**A.  Background and Parties**

Heard is an IDOC prisoner. (Pl. 56.1 Resp. Wexford ¶ 1.) Wexford has a contract with IDOC to provide medical care to inmates and was responsible for Heard's medical care at Pontiac

---

[1] Wexford and Ghosh moved together for summary judgment. Elyea moved separately. Where there is overlap between Heard's Local Rule 56.1 responses to the two separate statements of fact, the Court cites his response to Wexford and Ghosh's statement.

Correctional Facility ("Pontiac") between March 2000 and February 2003, Stateville Correctional Facility ("Stateville") at various points between March 2004 and March 2006, and Menard Correctional Facility ("Menard") between March 2006 and May 2007, when his hernias were finally repaired. (*Id.* ¶ 2.) Ghosh, a medical doctor and a Wexford employee, was the medical director at Stateville when Heard was incarcerated there. (*Id.* ¶ 3.) As the on-site medical director, Ghosh was responsible for deciding whether particular surgical procedures for prisoners were warranted. (Pl. 56.1 Resp. Elyea ¶ 14.) Dr. Lawrence Ngu, also a Wexford employee, was a staff physician at Stateville at the same time. (Pl. 56.1 Resp. Wexford ¶ 4.)[2] On-site vendor physicians like Ghosh and Ngu were responsible for providing the day to day medical care to IDOC prisoners. (Pl. 56.1 Resp. Elyea ¶¶ 12-13.) Elyea, also a doctor, was IDOC's Agency Medical Director between 1996 and 2007. (Pl. 56.1 Resp. Elyea ¶¶ 5, 8.) In that capacity, Elyea was not a treating doctor, but among other duties would review correspondence from prisoners requesting surgery that had been previously denied by a vendor physician. (Pl. 56.1 Resp. ¶ 16.)

  B.  **Hernias in General and Wexford's Hernia Policy**

A hernia is a sac formed by the lining of the abdominal cavity bulging through a hole in the the abdominal wall. (*See* Abdominal hernia, J. Am. Med. Assoc. available at http://jama.ama-assn.org /content/305/20/2130.full.pdf (last accessed Feb. 24, 2012).) An inguinal hernia is a bulge in the groin area. (*Id.*) A "reducible" hernia is a bulge that can be pushed back into the body; an "incarcerated" hernia is one that cannot be pushed back in. (*Id.*) A hernia can become "strangulated," meaning the tissue is stuck inside the hole and its blood supply has been cut off,

---

[2] On September 8, 2011, Ngu was dismissed from the case by stipulation of the parties.

2

requiring emergency surgery. (*Id.*) The standard treatment (and only long-term solution) for hernias is surgical repair, called a herniorrhaphy. (Wexford 56.1 Resp. ¶ 2.)

Wexford's hernia policy during the time in question was "watchful waiting," meaning that prisoners with reducible hernias were under no medical risk. (Wexford 56.1 Resp. ¶ 2.) Specifically, Wexford's policy stated that "[p]atients with stable abdominal wall hernias are not, in general, candidates for herniorrhaphy and will be monitored and treated with appropriate non-surgical therapy." (Pl. 56.1 Resp. Wexford ¶ 36.) Before Wexford put the "watchful waiting" policy in writing, Wexford's general surgery policy was to deny surgery unless it was "medically necessary," meaning the surgery was required to prevent the patient's condition from getting worse. (Wexford 56.1 Resp. ¶ 2.) Between 1996 and 2000, Wexford's policy was that herniorrhaphies were usually not medically necessary. (*Id.* at ¶ 3.)

### C. Heard's Hernia History

Heard was first diagnosed with a single hernia while in Cook County Jail in 1995, and was later diagnosed with a double hernia in 2000. (Pl. 56.1 Resp. Wexford ¶ 11.) In 1996, while incarcerated at Pontiac, Heard sought treatment for his hernia and an IDOC doctor recommended that it be surgically repaired. (Wexford 56.1 Resp. ¶ 5.) Pontiac's medical director at the time, Dr. George Castrovillo, approved the treating physician's recommendation for surgery, but for reasons not clear in the record, that surgery never took place. (*Id.*) Heard again sought hernia treatment from a doctor at Pontiac in 2000, who noted a right inguinal hernia that was "easily reducible" and "non-tender." (*Id.* ¶ 6.) In June 2000, Dr. Arthur Funk, Castrovillo's successor, denied Heard's request for surgery, noting the surgery was "elective." (*Id.* ¶ 7.) On March 28, 2001, Heard visited Funk, who noted in his records that Heard wanted him to note that his hernias were painful; Funk did not

3

recommend surgery. (*Id.* ¶¶ 9-10.) As a general matter, the parties dispute whether Heard complained of pain from his hernias (and how serious his pain was) when he saw Ghosh and Ngu, though Ghosh conceded that he had no reason to doubt Heard was in pain. (*See e.g., id.* ¶¶ 29-30; Ghosh Dep. at 70, 75 ("I did not see that he was in that much pain really when I was seeing him or anything.")) Heard claims he complained of pain at all his doctor visits and the hernia pain made him less active and affected his mobility. (*Id.* at ¶ 36; Pl. 56.1 Resp. Wexford ¶ 14.) Similarly, the parties dispute whether various Wexford doctors explained to Heard the risks of observation versus surgery. (Wexford 56.1 Resp. ¶ 10.)

Heard complained in grievances and letters to Funk in 2002 that his hernias were painful, but his requests for surgery were again denied per "established health care procedures." (*Id.* ¶ 11.) After IDOC transferred Heard to Stateville, Ngu examined him in March 2003 and diagnosed him with a right reducible inguinal hernia and a normal left inguinal area. (Pl. 56.1 Resp. Wexford ¶ 12.) Heard told Ngu he had intermittent pain. (Wexford 56.1 Resp. ¶ 13.) Ngu recommended observation and prescribed Motrin for the pain. (*Id.*) A few months later, Stateville's medical director at the time (not Ghosh) denied Heard's request for surgery again. (*Id.* at ¶ 14.) By August 2004, Heard's right hernia had descended into his scrotum, and the pain associated with the hernia ranged from mild discomfort to extreme pain. (*Id.* at ¶ 15; Pl. 56.1 Resp. Wexford ¶ 15.) Ngu increased Heard's Motrin prescription and, given Heard's worsening pain, requested a surgical evaluation. (Wexford 56.1 Resp. ¶¶ 15-16.) An independent surgeon not affiliated with Wexford recommended surgical repair. (*Id.* at ¶ 17.) Ghosh, now medical director at Stateville, denied that request in favor of his own examination of Heard, noting that the hernias were not complicated. (*Id.* at ¶ 18; Ghosh Dep. at 48-49; Pl. 56.1 Resp. Wexford ¶ 18.) Ghosh examined Heard a few weeks

later, found reducible hernias, and prescribed him a muscle relaxant to treat his hernia pain as well as the pain associated with a shoulder injury. (Wexford 56.1 Resp. ¶ 19; Ghosh Dep. at 40; Pl. 56.1 Resp. Wexford ¶¶ 21-22.) Though Ghosh did not recommend surgery for Heard at that point, he conceded at his deposition that nothing existed in Heard's medical history that suggested Heard was not eligible for surgery. (Wexford 56.1 Resp. ¶ 20.) Had Ghosh approved the surgery, Heard would have been sent to University of Illinois at Chicago (UIC) at no charge to Wexford or IDOC. (Pl. 56.1 Resp. Wexford ¶¶ 32-33.)

Ngu saw Heard again on March 2, 2005 after Heard complained of worsening pain. (Wexford 56.1 Resp. ¶¶ 26-27.) Ngu increased Heard's prescription for Motrin and requested a second surgical consultation. (*Id.* at ¶ 27.) On March 9, Ghosh again denied the surgery request—this time before the surgeon examined Heard—despite knowing that Heard had complained of worsening pain. (*Id*. at ¶ 29.)[3] The consultation went forward anyway on March 16 and the surgeon, in consideration of Heard's worsening pain, again recommended surgery; he conceded it was elective surgery. (Pl. 56.1 Resp. Wexford ¶ 25; Wexford 56.1 Resp. ¶ 28.) Two months later, in May 2005, Ghosh examined Heard again and found hernias; however he disagreed with the surgeon's recommendation and did not approve surgery. (*Id*. at ¶ 30; Pl. 56.1 Resp. Wexford ¶¶ 27-30.) In short, Ghosh determined surgery for Heard's hernia was "elective" and that Wexford's policy with respect to elective surgery is to monitor the patient's condition. (Wexford 56.1 Resp. ¶ 31;

---

[3] At his deposition, Ghosh said he read Ngu's notes concerning Heard's reports of worsening pain but asserted that he did not know that Heard's pain was worsening when he examined him in March 2005. (Ghosh Dep. at 75.) Drawing the reasonable inference in Heard's favor, as the Court must, Ghosh knew Heard complained to Ngu about worsening pain.

Ghosh Dep. at 115.) In 2005 and 2006, IDOC denied several grievances from Heard where he complained of pain from his hernias. (Wexford 56.1 Resp. ¶¶ 32-33.)

Finally, on May 22, 2007, Heard's hernia became incarcerated and painful and prison officials took him to a hospital emergency room. (*Id*. at ¶ 35.) The next day, after the hernias were partially reduced with sedatives, a surgeon fixed Heard's hernia. (*Id*.; Doc. 302-12, Ex. 45.) During the surgery, the surgeon found significant scarring in the Heard's hernia sac caused by repeatedly popping the hernia back into place, which complicated the surgery. (Wexford 56.1 Resp. ¶ 37.) The surgeon testified at his deposition that the scarring was more prevalent on one side, which indicated that the hernia on that side was incarcerated more severely or for a longer period of time. (Doc. 302-3, Liefer Dep. at 39.)

### D. Elyea's Involvement in Heard's Care

As noted above, as IDOC's Agency Medical Director, Elyea was responsible for reviewing requests from prisoners for surgery after the on-site vendor doctors denied that request. During his time in that position at IDOC, Elyea reviewed "hundreds or thousands" of prisoner requests for surgery, which would come through the grievance process. (Pl. 56.1 Resp. Elyea ¶¶ 16-19.) Elyea could ultimately overrule the vendor physician's determination regarding whether or not to order surgery. (*See* Doc. 282-2, Elyea Resp. Int. ¶ 4.)[4] When he received these appeals from prisoners, Elyea would typically call the prison and speak to the medical director about the inmate's care, and would occasionally review the prisoner's medical records. (Pl. 56.1 Resp. Elyea ¶ 20.) He would

---

[4] Perhaps because of some confusion during Elyea's deposition regarding the distinction between appeals for review by a site's medical director and those made by prisoners, there is some dispute in the record whether Elyea or Ghosh, as the on-site vendor physician, had final decision-making authority as to whether Heard could have surgery or not. (*See* Pl. 56.1 Resp. Elyea ¶ 11.) Elyea's interrogatory responses state that "[a]ppeals of care may be made by the offender through the grievance process and then to the Agency Medical Director of IDOC." (Doc. 282-2 at 45.) Construing that response in Heard's favor, Elyea could have ordered surgery for Heard.

then defer to the site's medical director or the prisoner's treating physicians as to course of treatment. (*Id.* ¶ 21.)

In September 2004, Heard wrote to then-Governor Rod Blagojevich and complained that his hernias were painful and that Ghosh had refused to approve surgery to repair them. (Elyea 56.1 Resp. ¶ 22.) The Governor's office forwarded that letter to Elyea, who responded to Heard, in part, as follows:

> Your medical record was reviewed with the medical director at Stateville Correctional Center where you are presently housed. You have been seen frequently for your medical concerns and have not had any findings that would warrant surgery at this time. . . . [Y]our medical care to this point has been well within reasonable and acceptable standards and you should [sic] to be followed regularly for your problem.

(Elyea 56.1 Resp. ¶ 21.) A few months later, in response to a letter sent by Heard's sister to IDOC, Elyea wrote:

> I spoke directly with the medical director at Stateville Correctional Center where your brother is currently housed and the record reveals very clearly that your brother has been seen regularly for his condition. While HIPPA guidelines do not allow me to provide you with all of the details of his examinations, I can tell you that his care has been well within reasonable and acceptable standards. He has been prescribed pain medication for the occasional discomfort he has reported. According to the medical record your brother did have surgery in 1996 and now has a bilateral [sic] conditions which do not warrant surgery at this time.

(Elyea 56.1 Resp. ¶ 24.) At his deposition, Elyea testified that he never personally reviewed Heard's medical records, and he never personally examined or treated Heard. (Doc. 302-8, Elyea Dep. at

7

149, 158.) Rather, as was his typical practice, he simply called Ghosh, who relayed the details of Heard's care and treatment. (*Id.* at 131-32, 149.)[5]

## II.  STANDARD

Summary judgment is proper when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court may "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands

---

[5]Both Heard and Ghosh/Wexford offered proposed expert testimony. Plaintiff's expert, Dr. Scott Glazer, concludes that there was no reasonable medical basis for denying surgery for Heard and Ghosh's decision to wait on surgery risked Heard's life. Ghosh and Wexford, in turn, offered two experts, Drs. Bruce Doblin and Thomas Lundquist. Because the Court determines that a reasonable jury could find in Heard's favor based on the underlying facts of the case, the Court has not considered the proposed expert testimony or the parties' half-hearted *Daubert* challenges to the qualifications of each other's experts. Both sides claim that the other's doctor is the wrong type of doctor to be opining on hernias: Glazer is a anesthesiologist and Lundquist is a pediatrician. The parties may renew their *Daubert* challenges before trial, but the Court notes that generally, pain and hernia treatment are basic matters of anatomy that any medical doctors would have sufficient knowledge of. *See Banister v. Burton*, 636 F.3d 828, 832 (7th Cir. 2011) (upholding district court's finding that any "physician who studied anatomy" could testify as to the plaintiff's physical abilities); *Gayton v.McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats").

something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'"). Heard, as the party opposing the motion for summary judgment, "gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011).

### III. DISCUSSION[6]

#### A. Eighth Amendment Standard

Heard asserts that the defendants violated his constitutional right to be free from cruel and unusual punishment. "The Eighth Amendment's prohibition against cruel and unusual punishment, which embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency,' prohibits punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). Consequently, the government must provide "medical care for those whom it is punishing by incarceration." *Id.* at 103. "The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 102). Accordingly, "deliberate indifference to serious medical needs" of a prisoner is unnecessary and wanton infliction of pain and is forbidden by the Constitution. *Id.* at 104.

---

[6] Heard has two cases currently pending against medical providers as a result of his hernias, this one and a second in the Southern District of Illinois. In that case, Heard alleged that Wexford, two doctors employed by Wexford, and Elyea were deliberately indifferent to his hernias while he was incarcerated at Menard Correctional Facility. (*See* Case No. 09 C 449, S.D. Ill.) The court presiding over that case denied Wexford and its employees' motions for summary judgment on the merits, but granted Elyea's on statute of limitations grounds.

A deliberate indifference claim has two parts: an objective component and a subjective component. *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011). First, the inmate must demonstrate, objectively, that the claimed deprivation was "sufficiently serious; that is, it must result in the denial of the minimal civilized measure of life's necessities." *Id.* (internal citation omitted). Where, as here, the prisoner asserts he received inadequate medical care, "this objective element is satisfied when an inmate demonstrates that his medical need itself was sufficiently serious." *Id.* A medical need is "sufficiently serious" when the prisoner's condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). Here, the defendants do not dispute that Heard had an objectively serious medical condition, and there is no question that Heard's hernias and the resulting pain are objectively serious medical conditions under the Eighth Amendment standard. *See Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (reiterating that hernia and chronic pain are objectively serious medical conditions and collecting cases).

As for the subjective component, the inmate must establish that prison officials acted with a "sufficiently culpable state of mind." *Roe*, 631 F.3d at 857. Though negligence or inadvertence will not be sufficient to show deliberate indifference, "it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Id.* (quoting *Greeno*, 414 F.3d at 653). In other words, "an inmate need not establish that prison officials actually intended harm to befall him from the failure to provide adequate medical care." *Roe*, 631 F.3d at 857.

B.  **Deliberate Indifference for Medical Professionals**

Focusing on the second prong of the Eighth Amendment test, the Defendants assert that no reasonable jury could find they had the required deliberately indifferent state of mind. Because deliberate indifference is not medical malpractice,

> [a] medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). That said, the plaintiff does not have to show that the medical professional "literally ignored" his demands for medical treatment, and the defendant cannot absolve himself from liability because he gave the inmate some treatment, if the treatment was "blatantly inappropriate." *Greeno*, 414 F.3d at 653-54. Further, the Eighth Amendment protects the inmate from deliberate indifference as to his current health problems as well as indifference to "conditions posing an unreasonable risk of serious damage to *future* health." *Roe*, 631 F.3d at 858 (quoting *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005)) (emphasis in original).

1.  **Ghosh**

Ghosh asserts that he treated Heard's hernia properly, if "conservatively," and that Heard's challenge to that decision is nothing more than a disagreement with his medical judgment. This case is remarkably similar to *Gonzalez v. Feinerman*, 663 F.3d 311 (7th Cir. 2011). In that case, a prisoner sued prison doctors because they refused to authorize surgery for his increasingly painful hernia. *Id.* at 313. As here, the plaintiff was diagnosed with a hernia a number of years before filing

suit, and complained of more and more pain as the years passed. *Id*. The defendant physicians (one whom is a defendant in Heard's other case) refused to authorize surgery, presumably because the hernia was reducible and not incarcerated or strangulated. *Id.* The district court granted the defendants' motion to dismiss, finding that even if the plaintiff's allegations were true, the ongoing refusal to authorize surgery could not be a departure from accepted professional standards because the hernia was not incarcerated or strangulated. *Id*.

The Seventh Circuit reversed that ruling, citing various medical literature, including the article cited in this case as the inspiration for Wexford's "watchful waiting" policy. *Id*. at 314 (citing Robert J. Fitzgibbons & Anita Giobbe-Hurder, *Watchful Waiting vs Repair of Inguinal Hernia in Minimally Symptomatic Men*, 295 J. Am. Med. Assoc. 285 (2006)). Specifically, the Seventh Circuit found that a reasonable factfinder could find deliberate indifference on the part of the doctors because "[w]hile surgery can be postponed, delay is recommended only for patients with minimal or no symptoms." *Id*. The plaintiff was not asymptomatic, as he "had been suffering from his hernia for almost seven years, and during the last two of those years his hernia continued to worsen, was constantly protruding, and was causing extreme pain." *Id.* Given the worsening pain, the plaintiff's doctors "were obligated not to persist in ineffective treatment" and a "factfinder reasonably could infer [the defendants] substantially departed from professional judgment by refusing to authorize surgical repair for [the plaintiff's] painful hernia." *Id.* at 314-15 (citing *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010), among other cases, and noting "[d]elay in treating a condition that is painful even if not life-threatening may well constitute deliberate indifference ...."). Heard's hernia was not repaired for 13 years after it was first diagnosed. Though the parties dispute the severity and frequency of Heard's pain, the defendants do not suggest Heard had no pain, and the scarring found

12

when the hernia was ultimately repaired is consistent with significant pain. In short, Heard has demonstrated facts that are more compelling than the set of facts that the Seventh Circuit found in *Gonzalez* to be sufficient, as a matter of law, for a reasonable jury to infer deliberate indifference.

Further, Ghosh refused to authorize the surgery even though: (1) a surgeon recommended repair three times; and (2) it was authorized by Pontiac's medical director in 1996, when Heard's pain was presumably less severe than it was when Ghosh saw him. While simply disagreeing with a specialist's recommendation is likely not sufficient, by itself, to show deliberate indifference, the jury could reasonably infer deliberate indifference in these circumstances in part from Ghosh's dogged refusal to approve what the Seventh Circuit suggested in *Gonzalez* is a routine surgery. *See Berry*, 604 F.3d at 441-42 ("Where [the inmate] made a modest request for treatment . . ., [the doctor's] obdurate refusal to alter [the inmate's] course of treatment despite his repeated reports that the medication was not working and his condition was getting worse, is sufficient to defeat her motion for summary judgment."); *Gonzalez*, 663 F.3d at 314 (noting "750,000 surgical repairs [of hernias] are performed each year in the United States."); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (finding a six month delay in referring a patient to a specialist and then not following the specialist's advice was sufficient for a reasonable fact-finder to find deliberate indifference); *Gil v. Reed*, 381 F.3d 649, 664 (7th Cir. 2004) (denying summary judgment to a doctor who cancelled one medication in favor of another against the explicit instructions of a specialist); *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (allegations of "refusal . . . to follow the advice of a specialist can also state an Eighth Amendment claim."). Finally, Heard suggests that Ghosh would not approve the surgery because of the cost of surgery and the potential for a negative performance review from Wexford or IDOC if he approved too many surgeries. In response, Ghosh asserts that theory is

13

nonsense because UIC would have operated on Heard at no cost to Wexford or IDOC. Ghosh's point, however, cuts both ways: a reasonable jury could also infer Ghosh had deliberately indifferent state of mind by not approving a surgery that would cost his employer nothing. In sum, Heard's claim against Ghosh must go to trial.

### 2. Wexford

Wexford may be held liable for deliberate indifference to Heard's medical needs under the Eighth Amendment along with its employee Ghosh if Wexford maintained a policy or a custom that violated Heard's rights. *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (private contractors that provide medical services to prisoners are treated like municipalities for purposes of § 1983); *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) (a "municipality may be liable for harm to persons incarcerated under its authority 'if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners.") (internal citation omitted). The "policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation, which a plaintiff may show directly by demonstrating that the policy is itself unconstitutional." *Minix*, 597 F.3d at 832 (citing *Novack*, 226 F.3d at 530-31.) Here, the Court has already found that a reasonable jury could find Ghosh was deliberately indifferent, and Heard has presented sufficient evidence that Ghosh was following Wexford's policy when he chose to go against the surgeons' recommendation and not authorize surgery. *See Heard v. Wexford Health Sources*, No 09-446, 2011 WL 4475168, at *8 (S.D. Ill. Jun. 28, 2011) *adopted in part by* 2011WL 4479309 (Sep. 26, 2011) (denying summary judgment to Wexford because the Pontiac doctors followed Wexford's policy when they denied surgery for Heard and Heard produced Wexford's written policy).

Further, a reasonable jury could find that Wexford was deliberately indifferent to the prisoners in its care in general because its hernia policy was unconstitutional as to patients with hernias that are not strangulated or incarcerated because it does not account for the pain caused by the hernia. "A delay in the provision of medical treatment for painful conditions – even non-life-threatening conditions – can support a deliberate indifference claim, so long as the medical condition is sufficiently serious or painful." *See Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (citing *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997)); *Arnett*, 658 F.3d at 753 (same); *see also Roe*, 631 F.3d at 860 ("[i]n the prison context . . . [treatment] protocols must ensure that prison fulfill their responsibility to provide constitutionally adequate care to each individual inmate with reference to his particularized medical need.") Wexford's policy simply does not consider the patient's level of pain as a factor in whether or not the patient should have surgical repair of his hernias. Indeed, the policy does not mention pain at all. Consequently, as written, the policy counsels against routine surgery for hernias that are very painful but not strangulated or incarcerated. Given that Heard has demonstrated that a patient could endure years of intermittent hernia pain before the hernia becomes strangulated or incarcerated, a reasonable jury could find that the policy is unconstitutional for patients like Heard with painful though reducible hernias.

### 3. Elyea

Elyea argues that he is entitled to summary judgment because, given the number of requests from prisoners during his career at IDOC, he properly deferred to the on-site medical director when he agreed with Ghosh's decision to deny surgical repair of Heard's hernias. Specifically, Elyea asserts in his brief that in response to the two letters forwarded to him regarding Heard, he "spoke to the Medical Director for Stateville Correctional Center and reviewed Plaintiff's medical records."

(*See* Doc. 283 at 7.) According to Elyea, after speaking to Ghosh, he "used his clinical judgment to determine that there were no findings that warranted surgery at the time." (*Id.*) Though a difference of opinion between an inmate and a doctor is not deliberate indifference (*see Gil*, 381 F.3d at 663), the caselaw presupposes that the medical professional actually exercised his clinical judgment with respect to the inmate's case. Elyea's deposition testimony contradicts his statements in Defendants' brief suggesting that he reviewed Heard's medical records and arrived at an independent clinical judgment. Elyea made clear that he *did not* review Heard's medical records and instead relied on his conversations with someone else, presumably Ghosh as medical director. (Elyea Dep. at 79, 149.)[7] Indeed, due to a mis-communication (presumably with Ghosh), Elyea told Heard's sister that Heard had surgery in 1996, when he did not. A reasonable jury could infer that, in this instance and given what Elyea knew from Heard's letters, Elyea exercised no clinical judgment at all - he merely rubber-stamped Ghosh's decision, even though Elyea could have overturned Ghosh's denial. In other words, the Court will not grant Elyea judgment as a matter of law because he exercised his clinical judgment when it is questionable whether he actually exercised any clinical judgment.[8]

---

[7] At his deposition, Elyea could not recall what the treating doctors said about whether Heard should have had surgery and did not recall talking to Ghosh about Heard. (Elyea Dep. at 79.)

[8] Further, Elyea presented no evidence that he could not have reviewed Heard's medical records in this case. He testified that he reviewed medical records in other cases.

16

## IV. CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment (Docs. 272 and 281) are denied.

```
_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois
```

Date: March 12, 2012